JUANITA NORMAN,
Administratrix ad
Prosequendum of the ESTATE of
SHERRON J. NORMAN, Deceased,

     Plaintiff,

v.

HADDON TOWNSHIP, HADDON
TOWNSHIP POLICE CHIEF MARK
CAVALLO, BOROUGH OF OAKLYN,
OAKLYN POLICE CHIEF JOSEPH T.
ABBATE, WOODLYNNE BOROUGH,
WOODLYNNE POLICE DIRECTOR
EDWIN FIGUEROA, BOROUGH OF
COLLINGSWOOD, COLLINGSWOOD
POLICE CHIEF RICHARD J.
SARLO, CITY OF CAMDEN,
POLICE CHIEF JOHN
SCOTT THOMSON, and OFFICERS
WILLIAM BENHAM, JOSEPH
SULLIVAN, SCOTT DEMPSEY,
CHARLES BLANCHARD, PAUL
MASON, JOHN ROBINSON, BRIAN
DICUGNO, JON SIEROCINSKI,
YVETTE TRUITT, HERIBERTO
INOSTROZA and JAMES ALLEN,
individually and/or in their
official capacities, jointly,
severally, and/or in
the alternative,

     Defendants.

1:14-cv-06034-NLH-JS

**OPINION**

**APPEARANCES:**

SHARON A. KING
STANLEY O. KING
KING & KING, ESQS.
231 SOUTH BROAD STREET
WOODBURY, NJ 08096

On behalf of Plaintiff

FRANCIS X. DONNELLY
ROBERT J. GILLISPIE, JR.
MAYFIELD, TURNER, O'MARA, DONNELLY & MCBRIDE, PC
2201 ROUTE 38
SUITE 300
CHERRY HILL, NJ 08002
    On behalf of Defendants Haddon Township, Mark Cavallo,
    William Benham, Joseph Sullivan, Scott Dempsey, Charles
    Blanchard

WILLIAM F. COOK
WILLIAM M. TAMBUSSI
CHRISTOPHER ALBERT REESE
BROWN & CONNERY, LLP
360 HADDON AVENUE
PO BOX 539
WESTMONT, NJ 08108
    On behalf of Defendants Borough of Collingswood, Chief
    Richard J. Sarlo, Brian Dicugno, and Jon Sierocinski,
    Borough of Oaklyn, Chief Joseph T. Abate, and Paul Mason,
    and Borough of Woodlynne, Police Director Edwin Figueroa,
    and Jon Robinson

DANIEL EDWARD RYBECK
JOHN C. EASTLACK, JR.
WEIR & PARTNERS LLP
215 FRIES MILL ROAD
2ND FLOOR
TURNERSVILLE, NJ 08012
    On behalf of Defendants City of Camden, Police Chief John
    Scott Thomson, Yvette Truitt, Heriberto Inostroza and James
    Allen

**<u>HILLMAN</u>**, District Judge

This case involves claims of excessive force, false arrest, failure to intervene, and other state law torts by various police officers, and claims of municipal liability against four municipalities for their practices and customs, all of which led to the death of Plaintiff's brother. Presently before the Court

are the motions of Defendants for summary judgment in their favor. For the reasons expressed below, Defendants' motions will be granted as to the Collingswood, Oaklyn, Woodlynne, and Camden defendants, as well as Haddon Township police officers Charles Blanchard and Scott Dempsey, and denied without prejudice as to Haddon Township, Mark Cavallo, William Benham, and Joseph Sullivan.

**BACKGROUND**

At 12:41 a.m. on September 29, 2012, an employee of Crown Fried Chicken located at the intersection of Mount Ephraim Avenue and Collings Avenue in Haddon Township, New Jersey called 911 to report that a male was causing a disturbance in the restaurant. According to the 911 call, the employee repeatedly asked dispatch to send police "quickly" because the man was breaking things in the store, including a machine and a door. A man is heard yelling loudly in the background. At 12:43 a.m., the man, who was subsequently identified as Sherron Norman, the brother of Plaintiff Juanita Norman, left Crown Fried Chicken and walked out and onto the street.[1]

---

[1] The security camera footage of the events inside Crown Fried Chicken reveals that Norman did not purchase anything from the Crown Fried Chicken, slammed the counter on several occasions without any apparent provocation, pulled his pants down and walked around the store with his pants around his ankles, allowing contents to spill out, slammed a cash register with his

Camden County Central Communications dispatched Defendant William Benham, a Haddon Township police officer, and Defendant Joseph Sullivan, a Haddon Township special law enforcement officer. The police dispatch stated that there was a "psych emergency," and per Haddon Township protocol, an ambulance was dispatched at the same time.

At the time of his dispatch, Benham's dash camera was activated. Benham arrived on scene at approximately 12:44 or 12:45 a.m. (recorded as "00:44:40")[2] and immediately encountered Norman, who was jogging toward Benham's vehicle wearing only a t-shirt and boxer shorts. The dash camera was facing Crown Fried Chicken, and the remainder of the footage captures only the off-camera sounds of Benham's and other officers' interactions with Norman.

At 00:44:42, Benham exited his vehicle and asked, "What's going on?" From 00:44:42 to 00:46:40, Norman and Benham have an inaudible discussion, and then a struggle. Sullivan arrived on

---

right hand, causing a part of the register to fall to the floor, slammed a cash register twice with his left hand, broke a door, violently shoved an unidentified bystander after the bystander tried to assist in removing Norman from the store, and made continuous, unintelligible yelling noises throughout the encounter.

[2] For ease of reference, we will refer infra to the time as recorded by the dash camera.

the scene during the struggle, finding Norman lying on his stomach and Benham on his knees. At this same time, Benham radioed for police assistance using code 10-26.[3] Sullivan helped Benham handcuff Norman, and after one of the officers says "Ready?", they lifted him into the patrol car chest first on the back seat and then picked up his legs and slid him into the car.

From approximately 00:46:47 to 00:47:28, Norman can be heard as he is placed in the rear of Benham's vehicle. Sullivan can be heard advising Benham on how to adjust Norman in the rear of the vehicle. The officers then closed the car door, with Norman lying on his stomach with his head facing the back seat.

From 00:47:28 to approximately 00:48:18, Norman can be heard muttering, kicking a door, and at 00:48:08 yelling. Starting at approximately 00:48:18, Norman is quiet in the back of the vehicle. During this time, additional officers from other jurisdictions respond to Benham's 10-26 request for assistance.

At 00:49:30, Collingswood EMTs Timothy Tredanari and John Fleming, who were dispatched at the same time as Benham, are shown walking towards the driver's side of Benham's vehicle. At 00:50:17, Defendant Haddon Township Officer Scott Dempsey is

_____

[3] 10-26 is the radio code for assistance with detaining a suspect.

heard opening the door to Benham's vehicle and saying "Yo!" on multiple occasions in an apparent attempt to get Norman's attention.  At 00:50:43, Dempsey states, "I got nothing . . . I got no pulse."  At 00:50:49, Dempsey states, "Yo!" again.  At 00:50:57, Dempsey states to Defendant Woodlynne Officer Robinson, "See if you can feel it on his arm. Do you feel a pulse on his arm?"  At 00:51:03, Robinson states, "That's a negative."  An individual states, "I got no pulse," after which Norman is removed from the vehicle.  Officers are heard ordering removal of handcuffs and initiating CPR.  At 00:56:47, EMTs Tredanari and Fleming are observed wheeling Norman from the scene on a stretcher towards an ambulance.

EMTs Tredanari and Fleming immediately initiated basic life support, while Benham dispatched Virtua EMTs.  Virtua EMTs quickly arrived and transported Norman to Our Lady of Lourdes Hospital in Camden, New Jersey by ambulance, as Tredanari continued to provide CPR in the ambulance.  Norman could not be revived by medical personnel, and was pronounced dead at 1:35 a.m. at the hospital.  It is undisputed that Norman had used cocaine just before going to Crown Fried Chicken.[4]

_____

[4] The state medical examiner who performed an autopsy on Norman concluded that Norman's final cause of death was "toxic effect of cocaine," and declared the death to be an "accident." Plaintiff's expert also performed an autopsy, and he concluded

Plaintiff, as administratrix ad prosequendum of Norman's estate, has lodged numerous claims pursuant to 42 U.S.C. § 1983, the New Jersey Civil Rights Act, New Jersey's Wrongful Death Act and the New Jersey Survivorship Statute, against all the officers and municipalities that were involved in the events on September 29, 2012.

Plaintiff's original complaint brought the action against Haddon Township, its police chief, Mark Cavallo, its police officers William Benham, Joseph Sullivan, Scott Dempsey, and Charles Blanchard ("Haddon Township defendants"); the Borough of Oaklyn, its police chief Joseph T. Abate, and its police officer Paul Mason ("Oaklyn defendants"); Woodlynne Borough, its police chief, Kevin R. Cattell, and its police officer John Robinson ("Woodlynne defendants"); the Borough of Collingswood, its police chief, Richard J. Sarlo, and police officers Brian Dicugno and Jon Sierocinski ("Collingswood defendants"); and the City of Camden and its police chief John Scott Thomson ("Camden defendants").

As to defendants William Benham and Joseph Sullivan, she alleged excessive use of force and false arrest/false

_____

that Norman's cause of death was "asphyxia and cardiopulmonary arrest during restraint for bizarre behavior," and declared the death to be a "homicide." As discussed below, a jury must resolve this factual dispute.

imprisonment in violation of the Fourth Amendment. As to all defendants, she alleged failure to intervene to prevent the excessive use of force in violation of the Fourth Amendment and failure to provide medical attention by monitoring the decedent in violation of the Fourteenth Amendment.

As to Haddon Township, Chief Cavallo, Borough of Oaklyn, Chief Abate, Woodlynne Borough, Chief Cattell, Borough of Collingswood, Chief Sarlo, City of Camden and Chief Thomson, she alleged that these defendants adopted policies and customs of failing to enforce the laws, and failing to supervise and train their officers in the proper and lawful use of force, the execution of lawful arrests, the proper use of restraints and the provision of medical care for detainees. She also alleged that these municipal entities and their police chiefs failed to properly investigate known incidents of use of force. Plaintiff further alleged that all defendants violated the New Jersey Civil Rights Act. She also alleged common law claims of assault and battery as to Defendants Benham, Sullivan, and Haddon Township and Chief Cavallo; false arrest/false imprisonment as to Defendants Benham, Sullivan, Truitt, Haddon Township, Chief Cavallo, City of Camden and Chief Thomson; and negligence and gross negligence as to all defendants.

On October 1, 2015, Plaintiff filed a First Amended Complaint, where she substituted Camden police officers, Yvette Truitt, Heriberto Inostroza and James Allen for John Doe defendants 1 through 3, substituted Woodlynne Police Chief Kevin R. Cattell with Police Director Edwin Figueroa.

All the Defendants have moved for summary judgment in their favor on all of Plaintiff's claims. Plaintiff has opposed defendants' motions in all respects.

**DISCUSSION**

**A.    Jurisdiction**

Plaintiff has brought her claims pursuant to 42 U.S.C. § 1983 and New Jersey state law. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction of Plaintiff's state law claims under 28 U.S.C. § 1367.

**B.    Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  <u>Marino v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004)(quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Id.</u>  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict

those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-

57.  A party opposing summary judgment must do more than just

rest upon mere allegations, general denials, or vague

statements.  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir.

2001).

**C.  Analysis**

**1.  Plaintiff's § 1983 claims**

Section 1983 is not a source of substantive rights, but

provides a vehicle for vindicating the violation of other

federal rights.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).

Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory . . . subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable
> to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To state a claim for relief under § 1983, a

plaintiff must allege the violation of a right secured by the

Constitution or laws of the United States, and that the alleged

deprivation was committed or caused by a person acting under

color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988);

<u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

11

For Plaintiff's claims against the individual defendants acting in their personal capacity, the qualified immunity doctrine governs the analysis. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012). In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Pearson v. Callahan, 555 U.S. 223, 236 (2009). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Id. It is the defendant's burden to establish entitlement to qualified immunity. Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

> **a.  Plaintiff's excessive force, failure to intervene, and failure to provide medical attention claims against the individual officers[5]**

---

[5] Because the New Jersey Civil Rights Act was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under either the United States or New Jersey Constitutions, the NJCRA is interpreted

In determining whether excessive force was used in effecting an arrest, the Fourth Amendment's "objective reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d 810, 820–21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (relying on Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Id.

---

analogously to § 1983.  See Pettit v. New Jersey, 2011 WL 1325614, at *3 (D.N.J. 2011).  Thus, Plaintiff's NJCRA violation claims will proceed or fail for the same reasons as Plaintiff's § 1983 claims.

"'Courts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior.'" Peterson v. Holmes, 2017 WL 1653949, at *8 (D.N.J. May 2, 2017) (quoting Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002)). A police officer is liable for failure to intervene under § 1983 if the plaintiff demonstrates that: (1) the officer had reason to know that excessive force was being used; and (2) the officer had a realistic opportunity to intervene. Id. (citing Smith, 293 F.3d at 650).

For Plaintiff's claim that Defendants were deliberately indifferent to Norman's serious medical need by not monitoring his condition while in the police vehicle, the Eighth Amendment Cruel and Unusual Punishments Clause does not apply until an inmate has been both convicted of and sentenced for his crimes. Instead, a detainee, such as Norman, can bring a deliberate indifference claim against a state actor pursuant to the Fourteenth Amendment. Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012). Although a detainee may be entitled to greater protection than a convicted inmate, "it is well established that, under the Constitution's guarantees of due process, an unsentenced inmate is entitled, at a minimum, to no less protection than a sentenced inmate is entitled to under the

Eighth Amendment." Id. (citation, quotation marks and
alterations omitted); see also Groman v. Township of Manalapan,
47 F.3d 628, 637 (3d Cir. 1995) ("Failure to provide medical
care to a person in custody can rise to the level of a
constitutional violation under § 1983 only if that failure rises
to the level of deliberate indifference to that person's serious
medical needs."); Del Tufo v. Township of Old Bridge, 685 A.2d
1267, 1272 (N.J. 1996) ("The police's duty of care to an
arrestee requires the exercise of reasonable care to preserve
the life, health, and safety of the person in custody.").

Thus, in assessing Plaintiff's deliberate indifference
claim in this case, the Court will apply the standard used for
assessing an inmate's deliberate indifference claim:

> For the delay or denial of medical care to rise to a
> violation of the Eighth Amendment's prohibition against
> cruel and unusual punishment, a prisoner must demonstrate
> "(1) that defendants were deliberately indifferent to [his]
> medical needs and (2) that those needs were serious."
> Rouse v. Plaintier, 182 F.3d 192, 197 (3d Cir. 1999).
> Deliberate indifference requires proof that the official
> "knows of and disregards an excessive risk to inmate health
> or safety." Natale v. Camden Cnty. Corr. Facility, 318
> F.3d 575, 582 (3d Cir. 2003) (quoting Farmer v. Brennan,
> 511 U.S. 825, 837 (1994)). We have found deliberate
> indifference where a prison official: "(1) knows of a
> prisoner's need for medical treatment but intentionally
> refuses to provide it; (2) delays necessary medical
> treatment based on a nonmedical reason; or (3) prevents a
> prisoner from receiving needed or recommended treatment."
> Rouse, 182 F.3d at 197. Deference is given to prison
> medical authorities in the diagnosis and treatment of

patients, and courts "disavow any attempt to second-guess
the propriety or adequacy of a particular course of
treatment ... (which) remains a question of sound
professional judgment." Inmates of Allegheny Cnty. Jail v.
Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring
v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).  Allegations
of negligent treatment or medical malpractice do not
trigger constitutional protections.  Estelle v. Gamble, 429
U.S. 97, 105-06(1976).

Pierce v. Pitkins, 520 F. App'x 64, 66 (3d Cir. 2013); see also

Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D.N.J. 2002) (internal

quotation marks omitted) ("This standard is in effect a two-

pronged test requiring that plaintiff prove: (1) that his

medical needs were objectively serious and (2) that defendant

exhibited deliberate indifference to those needs.").

Even though the determination of whether an officer acted

objectively reasonably or made a reasonable mistake of law, and

is thus entitled to qualified immunity, is a question of law

that is properly answered by the court, not a jury, the Third

Circuit has recognized that a judge should not decide the

objective reasonableness issue until all the material historical

facts are no longer in dispute.  Curley v. Klem, 499 F.3d 199,

211, 211 n.12 (3d Cir. 2007).  To do this, "[a] judge may use

special jury interrogatories, for instance, to permit the jury

to resolve the disputed facts upon which the court can then

determine, as a matter of law, the ultimate question of

qualified immunity." Id.  In other words, "[w]hen the ultimate

question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, . . . but responsibility for answering that ultimate question remains with the court." Id.

In this case, the Court must deny summary judgment and employ the special interrogatory procedure for the jury to resolve the disputed facts regarding Plaintiff's excessive force and failure to monitor claims as to Defendants Benham and Sullivan. After the Court's review of all the evidence in the record, it is clear that Plaintiff has set forth sufficient disputed material facts to send to a jury as to these two officers' use of force in effecting Norman's seizure, and his resulting condition in the car. It is also clear that all of the other officer Defendants are entitled to qualified immunity on Plaintiff's excessive force, failure to intervene, and failure to monitor claims.

### 1. Benham and Sullivan

First, with regard to Benham and Sullivan, a jury must determine what occurred during the time Benham stepped out of his vehicle and Norman's transport to the hospital. Benham claims that Norman appeared in a zombie-like state and there was no doubt that Norman was under the influence. When Benham asked

Norman, "What's going on?," Benham claims that Norman responded with grunting, growling, and groaning. Benham states that Norman then came after him, swinging his arms and then slammed him into the side of the patrol car. Benham states that he began to wrestle with Norman, and after they fell to the ground, he attempted to hold him while broadcasting a call for assistance. Sullivan arrived on the scene at this time, and he states that he knelt on the back of Norman's legs to prevent him from kicking. Benham claims that Norman bit him on the right hand, and he struck Norman three or four times in an effort to get Norman to release his bite. Sullivan states that he also struck Norman in the lower back with closed fists in an effort to get Norman to release his bite on Benham. Sullivan then assisted Benham in placing handcuffs on Norman.

While the officers were trying to put Norman into the back of the patrol car, Benham states that Norman bit him again on the right knee. They placed Norman in the vehicle, stomach down, and at that time the officers claim that Norman was out of control and trying to kick the windows of the patrol car. Benham states that he did not think Norman was kicking because he was having difficulty breathing since the seats were hard plastic and rigid. For about one minute while Norman was in the backseat, he kicked, muttered, and yelled. During this time,

Benham informed Defendant Sergeant Blanchard that Norman had bitten him twice, and he then went into Crown Fried Chicken to obtain information from the employees and witnesses as to what had occurred inside the restaurant.

Plaintiff's asserts that what is observed and heard from the dash camera footage conflicts with Benham's and Sullivan's accounts. Plaintiff contends that at the time Benham arrives there were no cuts or bruises to Norman's face, and he does not appear to be making noises or talking. Plaintiff argues that the patrol car vibrates contemporaneously with Norman's scream, suggesting that Norman, and not Benham, was slammed against the car and hollered in response to the impact. Plaintiff further argues that the sounds on the video are evidence Benham struck Norman, and Norman wailed in response. Plaintiff also contends that based on the location of the bite and Benham's description of how he was lying on top of Norman's back with Benham's arms under Norman's head/neck area, it is evident that Benham was choking Norman. Plaintiff states that Benham agrees that Norman did not punch, kick or otherwise strike any officer.

Plaintiff argues that when Sullivan arrived and also punched Norman, he and Benham dragged Norman while handcuffed into the car, which is evidenced by fresh bruising and scrapes on his knees in the autopsy report. Plaintiff states that the

process of placing Norman in the back seat lasted approximately 40 seconds, and that during the 40 seconds Benham and Sullivan were positioning Norman in the back seat, there is no evidence of the officers instructing Norman to sit up or any evidence that Norman resisted attempts to sit him up.

Plaintiff also argues that Benham's conflicting statements to the Camden County Prosecutor's Office and in his deposition casts doubt on Benham's account of what occurred.  Plaintiff further argues that the disparity in physical size between Benham (6'5", 270-280 lbs.), Sullivan (5'11", 165-170 lbs.), and Norman (5'8", 196 lbs.) evidences the severity of force used on Norman, particularly when these officers put their weight on top of him.

We conclude that a jury must assess the differing scenarios asserted by the parties order to determine what transpired between Norman and the defendant officers.

Second, in addition to determining what occurred between the time Norman appeared in front of Benham's police vehicle and his placement in the back seat, a jury must also consider the conflicting autopsy reports and medical opinions as to Norman's cause of death to determine whether Norman's position in the police vehicle was problematic and warranted monitoring.  The Gloucester/Salem/Camden medical examiner, Dr. Hisham A. Hashish,

determined Norman's death to be caused by the toxic effects of cocaine and an accident. Dr. Hashish's autopsy did not reveal any life-threatening injuries, and he ruled out occult trauma to the back, occult airway injury, or evidence of neck compression.

In contrast, the autopsy performed by Plaintiff's medical expert, Dr. Michael Baden, revealed prominent fresh bruises and abrasions on Norman's face, right side of the head, elbows, knees, right hand, right side of the back of the neck, and on the inner aspects of both upper arms. He also concluded that Norman died from asphyxia and cardiopulmonary arrest during restraint for bizarre behavior, and ruled the death a homicide. Moreover, Dr. Hashish also testified that the absence of physical findings of trauma does not mean that trauma was not applied to the body.

After a jury has answered special interrogatories regarding what occurred from the time Norman appeared in front of Benham's police car until Norman is taken away from the scene, the Court will then determine whether Benham's and Sullivan's use of force was objectively reasonable, and whether they were deliberately indifferent to Norman's serious medical need, in order to ultimately determine whether Benham and Sullivan are entitled to

qualified immunity.[6]  Such a course is especially important in a

case like this, where the alleged victim died during the course

of his seizure and cannot provide his account of what occurred.

See, e.g., Ortiz v. City of Camden, 2015 WL 3603933, at *5

(D.N.J. 2015) (stating that whether the officers acted in an

objectively reasonable manner in their use of force on the

decedent and are therefore entitled to qualified immunity could

only be determined by the Court after a jury resolved the

factual disputes, and that it was particularly necessary in that

case, where the decedent could not provide his own account of

what happened) (citing Tuite v. New Jersey, 2014 WL 5035707, *5

(D.N.J. 2014) (stating that because the alleged victim of

---

[6] The Court will also consider Plaintiff's false imprisonment
claim against Benham and Sullivan after the jury answers its
special interrogatories because Plaintiff's false imprisonment
claim is factually intertwined with Plaintiff's excessive force
claim.  See Wright v. City of Philadelphia, 409 F.3d 595, 602
(3d Cir. 2005) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)
(citations omitted)) (just like with a false arrest claim, a
claim for false imprisonment is that a seizure is made without
probable cause, and probable cause exists if "'at the moment the
arrest was made . . . the facts and circumstances within [the
officers'] knowledge and of which they had reasonably
trustworthy information were sufficient to warrant a prudent man
in believing that [the suspect] had committed or was committing
an offense'"; moreover, the constitutional validity of the
arrest does not depend on whether the suspect actually committed
any crime, and it is irrelevant to the probable cause analysis
what crime a suspect is eventually charged with, as probable
cause need only exist as to any offense that could be charged
under the circumstances).

excessive force by a police officer died as a result of the use of force, and therefore could not testify on his own behalf, the court was "particularly cognizant" of the duty "to examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts") (citing Tofano v. Reidel, 61 F. Supp. 2d 289, 301 (D.N.J. 1999) (Lamont v. New Jersey, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.")) (other citations omitted).

Consequently, Benham and Sullivan's motion for summary judgment must be denied at this time.

> **2. Remaining Defendant Officers - Scott Dempsey, Charles Blanchard, Brian Dicugno, Jon Sierocinski, Paul Mason, Jon Robinson, Yvette Truitt, Heriberto Inostroza, and James Allen**

Plaintiff's failure to intervene and monitor claims against the nine other officers who came to the scene cannot survive summary judgment.

Haddon Township police sergeant Charles Blanchard arrived at the scene at the same time as the EMTs, and he saw Norman in the back of Benham's patrol car. While Benham told Blanchard

his version of what had happened, Haddon Township officer Scott
Dempsey arrived at the scene. Benham went to Crown Fried
Chicken to gather information, and Dempsey looked in the car and
noticed that Norman was not moving. Blanchard told Dempsey to
check for a pulse, and finding none, Dempsey removed Norman from
the vehicle with the help of Woodlynne officer Jon Robinson.
Dempsey and Robinson began to render CPR, and at the same
moment, the EMTs also came to Norman's aid.

Brian Dicugno and Jon Sierocinski of the Collingswood
Police Department also arrived at the scene after Norman was
already in Benham's police car, and they saw several officers
from Haddon Township and other jurisdictions handling the scene.
They observed the EMTs arrive and they started to depart. Upon
noticing the need for Norman to have medical attention, they
returned to the area of Benham's car, with Sierocinski helping
to remove the handcuffs from Norman so he could receive medical
assistance.

Oaklyn police officer Paul Mason did not respond to the
initial dispatch, but came to the scene after Benham's 10-26
call. When he arrived, Norman was already in Benham's vehicle,
and he could hear Norman kicking the car door. Shortly
thereafter, Mason saw the EMTs arrive, and he continued to help
with crowd control.

Woodlynne police officer Jon Robinson arrived in response to Benham's 10-26 call.  He encountered Benham, who told him about his struggle with Norman.  Robinson checked on Norman in the back of the vehicle and saw Norman kicking the driver's side rear door.  Robinson then went to assist in crowd control, and within a couple of minutes, the EMTs arrived to assist Norman as per the "psych call" protocol.  After Haddon Township officer Dempsey checked on Norman's pulse, Dempsey asks Robinson to see if he could feel a pulse.  When he did not feel a pulse, Robinson helped Dempsey remove Norman from the vehicle, and, with the help of Collingswood officer Sierocinski, he removed Norman's handcuffs so that the EMTs could provide medical attention to Norman.

Camden City police officers Yvette Truitt, Heriberto Inostroza, and James Allen arrived earlier than the other responding officers, coming on the scene when Norman was face down and struggling with Benham and Sullivan.  They observed the scene next to each other about 30-40 yards away.  After Norman was put into the vehicle, Inostroza left the scene.  Allen saw the vehicle move because of Norman's kicking.  Allen and Truitt saw an officer next to the vehicle, and they observed another officer tap the window and say "hey buddy."  They observed Norman being taken out of the vehicle and one officer began

performing CPR, while another officer said that EMS was on its way.

Plaintiff claims that all of these officers failed in their duty to intervene in the use of force used by Benham and Sullivan against Norman, and were deliberately indifferent to Norman's serious medical condition while he was in the police car. The timeline of events in conjunction with the undisputed facts of the situation cannot support Plaintiff's claims against these officers.

Benham first engaged Norman at 00:44:42. Two minutes later, Norman was handcuffed and being placed in the car by Benham and Sullivan. These two minutes are when Plaintiff claims the other officers should have intervened to stop the alleged excessive force being used on Norman.

Blanchard, Dempsey, Dicugno, Sierocinski, Mason, and Robinson could not have intervened in the use of force because they arrived to the scene after Norman was already in the vehicle. Truitt, Inostroza, and Allen arrived during the struggle between Norman and Benham, but Norman was already face-down. The undisputed facts establish that these officers would have been objectively reasonable in concluding that Officers Sullivan and Benham had Norman and the situation under control. Even when viewing the evidence during this less-than-two-minute

time frame in the light most favorable to Plaintiff, it does not support that these three officers either had reason to know that excessive force was being used by Benham and Sullivan, or that they had a realistic opportunity to intervene. Thus, all of these nine officers are entitled to qualified immunity on Plaintiff's failure to intervene claims against them.

With regard to Plaintiff's deliberate indifference claims against these officers, the undisputed timeline of events also supports a finding of qualified immunity. At 00:47:28, Norman is left in the police vehicle. For about 50 seconds, from 00:47:28 – 00:48:18, Norman is heard yelling and kicking the door and window. Norman becomes quiet, and remains silent for about 50 seconds, the point at which the EMTs arrive. Thirty to forty seconds later, after the EMTs receive a quick briefing on what has occurred, they come to Benham's police car at the same time Dempsey is pulling Norman from the car at 00:50:17.

Even accepting as true that Norman's position lying sideways, handcuffed, with his face toward the back seat was improper, the evidence does not support that the officers who viewed Norman kicking or heard him yelling intentionally refused to provide Norman with medical treatment, delayed medical treatment, or prevented his medical treatment during those 50 seconds. This is also true for the time period when Norman

became still and silent, because the EMTs arrived when Norman
had been silent for less than a minute.

Plaintiff claims that these officers just "stood around"
doing nothing instead of intervening in Norman's deteriorating
condition when they knew his positioning could be fatal.  The
facts do not support that contention.  Norman was in Benham's
police car for a total of two minutes and forty-nine seconds
(00:47:28 – 00:50:17).  During this short time, the other
officers who responded to the call were apprised of what
transpired and undertook other duties, such as crowd control.
The officers from other towns also knew that Haddon Township
officers were primarily handling the scene, that the EMTs were
on their way, and that the EMTs had arrived, all within a couple
of minutes.

To support Plaintiff's claims that these nine officers were
deliberately indifferent to Norman's serious medical need,
Plaintiff must demonstrate that each of these nine officers
acted with "'obduracy and wantonness,'" "which has been likened
to conduct that includes recklessness or a conscious disregard
of a serious risk." Rouse v. Plantier, 182 F.3d 192, 197 (3d
Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 319
(1986)).  The nine officer defendants have discharged their
burden as the parties seeking summary judgment of showing that

28

the evidence, even when considered in the light most favorable to Plaintiff, does not support the finding that the officers failed to monitor Norman's condition in violation of Norman's constitutional rights. See, e.g., Gunter v. Township of Lumberton, 2012 WL 2522883, at *14 (D.N.J. 2012) (citing Singletary v. Pennsylvania Dept. of Corrections, 266 F.3d 186, 193 n.2 (3d Cir. 2001)) (noting that in order to survive a summary judgment motion in which the movant argues that there is an absence of evidence to support her case, the plaintiff must point to some evidence beyond her raw claim that the officer was deliberately indifferent); id. (granting summary judgment in favor of the defendant officers when "the total time span of the incidents in question - from Larry Gunter's 9-1-1 call at 1:29 a.m. to the arrival of the second ambulance at 2:05 a.m. - constitutes a period of only thirty-six minutes"; and "[d]uring that time, the officers responded to Mr. Gunter's medical needs as they arose—first for the head laceration with the call for medical assistance at approximately 1:43 a.m.- and second for advanced life support medical assistance when Mr. Gunter became unresponsive at the conclusion of the twelve minute struggled where he resisted arrest"); Hinton v. White, 2012 WL 6089476, at *6 (D.N.J. 2012) (quoting Groman v. Township of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995)("The record clearly establishes

that the police offered [the plaintiff] medical assistance....

Defendants were not deliberately indifferent to [the

plaintiff's] medical needs.")) (where a police car struck the

plaintiff, both defendant officers handcuffed the plaintiff,

secured bundles of heroin that the plaintiff tossed away from

his body, attempted to search the plaintiff's body, and then the

plaintiff then began screaming, finding that because the

undisputed facts demonstrated that the officers ceased their

search and called for an ambulance when it was apparent the

plaintiff was injured, the officers did not act with deliberate

indifference).

Consequently, in addition to Plaintiff's failure to

intervene claims, Scott Dempsey, Charles Blanchard, Brian

Dicugno, Jon Sierocinski, Paul Mason, Jon Robinson, Yvette

Truitt, Heriberto Inostroza, and James Allen are entitled to

qualified immunity on Plaintiff's deliberate indifference

claims.

### b. Plaintiff's <u>Monell</u> claims against the four municipalities

Municipalities and other local government units are among

those "persons" to which § 1983 liability applies.  Monell v.

New York City Dep't of Social Services, 436 U.S. 658, 690

(1978).  Local governments, however, cannot be held liable for

the actions of their employees solely based on the doctrine of *respondeat superior*. Id. at 691-95; Bielevicz v. Dubinon, 915 F. 2d 845, 849-50 (3d Cir. 1990). In order to successfully state a claim for municipal liability, a plaintiff must allege that the employees' actions were pursuant to a policy or custom of the municipality itself. Monell, 436 U.S. at 694; Watson v. Abington, 478 F.3d 144, 155 (3d Cir. 2007).

To show the existence of a policy or custom under Monell, a plaintiff must allege that the municipality acted or failed to act in any one of three ways. First, the municipality adopted an official policy that deprives citizens of their constitutional rights. Monell, 436 U.S. at 694. Second, it tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights. Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir. 2003). Third, it failed to "train, supervise, or discipline" its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights. City of Oklahoma v. Tuttle, 471 U.S. 808 (1985). "A municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citation omitted).

As a primary matter, Collingswood, Oaklyn, Woodlynne, and

Camden, and their named policy makers, Chief Richard J. Sarlo,

Chief Joseph T. Abate, Director Edwin Figueroa, Chief John Scott

Thomson, respectively, as entitled to judgment in their favor on

Plaintiff's Monell claims. This is because the lack of evidence

to support Plaintiff's constitutional violation claims against

these municipalities' officers also negates Plaintiff's claims

against the municipalities. See City of Los Angeles v. Heller,

475 U.S. 796, 799 (1986) ("Neither Monell v. New York City Dept.

of Social Services, 436 U.S. 658 (1978), nor any other of our

cases authorizes the award of damages against a municipal

corporation based on the actions of one of its officers when in

fact the jury has concluded that the officer inflicted no

constitutional harm. If a person has suffered no constitutional

injury at the hands of the individual police officer, the fact

that the departmental regulations might have authorized the use

of constitutionally excessive force is quite beside the

point."); Smith v. Gransden, 553 F. App'x 173, 178 (3d Cir.

2014) ("Because we will not disturb the jury's verdict that

Frampton is not liable for any constitutional violations, there

can accordingly be no derivative municipal claim based on

Frampton's actions. Further, to the extent that Smith argues

that Camden is nevertheless liable under § 1983 because its

32

unwritten policy caused a constitutional violation through officers on the scene other than Frampton, her argument is similarly unavailing, as it requires proof that a CPD officer on the scene violated Kashon Smith's constitutional rights by being deliberately indifferent to his medical needs.  Here, the jury found Smith did not prove any officer violated Kashon Smith's rights and thus, Camden could not be found liable and we will not disturb the District Court's ruling in favor of Camden." (internal citations and quotations omitted)); Reiff v. Marks, 511 Fed. App'x 220, 222–23 (3d Cir. 2013) (affirming the district court's dismissal of the plaintiff's failure-to-train municipal liability claim against West Reading Borough after a jury trial determined that the defendant officer's use of a TASER on the plaintiff was reasonable use of force because a municipality may not be held liable on a failure to train theory when a jury has found that the plaintiff has suffered no constitutional violation); cf. City of Canton, Ohio v. Harris, 489 U.S. 378, 391–92 (1989) ("[F]or liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.  Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs . . . . [W]hile claims such as

respondent's - alleging that the city's failure to provide training to municipal employees resulted in the constitutional deprivation she suffered - are cognizable under § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants.").

With regard to Plaintiff's Monell claim against Haddon Township, and its policy maker, Chief Mark Cavallo, the Court will bifurcate that claim from Plaintiff's claims against Benham and Sullivan. See Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial."). If, after a jury has answered its special interrogatories as to Plaintiff's § 1983 claims against Benham and Sullivan, the Court concludes that Benham and Sullivan did not violate Plaintiff's constitutional rights and they are entitled to qualified immunity, the principle announced in Heller and applied by the Third Circuit could warrant the dismissal of Plaintiff's municipal liability claims against Haddon Township and Cavallo. At a minimum, it would be a waste of judicial resources to assess Plaintiff's Monell claims

against Haddon Township and Cavallo now if such claims

ultimately are not viable based on how the jury assesses the

evidence of Benham's and Sullivan's alleged wrongdoing.[7]

---

[7] For example, if a jury concludes that the positioning of Norman
in the police vehicle did not cause his death, then Haddon
Township cannot be held liable for Norman's death based on its
policies or training regarding a detainee's positioning in a
police vehicle.  Conversely, if a jury determines that Norman's
death was caused by how he was placed in the police vehicle,
Haddon Township could be liable if an infirm policy or training
program on that issue is found to exist.  This is true even if
Benham and Sullivan are ultimately entitled to qualified
immunity, because a jury may find that they properly followed
Haddon Township's policy or training on detainee positioning,
but that the policy or training itself was so inadequate that it
violates the constitution.  Haddon Township would not be liable
under Monell, however, if Benham and Sullivan are found to have
harmed Norman by how they positioned him in the police vehicle
because they failed to follow a constitutionally appropriate
policy or training on detainee positioning.  These various
scenarios - and there are many more depending on how the jury
views the evidence - illustrate that a jury's resolution of the
facts is a necessary prerequisite to Haddon Township's liability
under Monell.  See, e.g., Fagan v. City of Vineland, 22 F.3d
1283, 1292 (3d Cir. 1994) (in a case where a high-speed police
pursuit of a car attempting to evade police officers crashed
into an innocent bystander's vehicle, killing three people and
injuring three people, and the survivors of the innocent
bystanders brought § 1983 claims for substantive due process
violations against the officers for their recklessness and the
town for its lack of proper training on high-speed pursuits, the
court noted that a finding of municipal liability did not depend
automatically or necessarily on the liability of any police
officer because, in a substantive due process case arising out
of a police pursuit, an underlying constitutional tort can still
exist even if no individual police officer violated the
constitution so long as it could be shown that the plaintiff
suffered the deprivation of life or liberty because the officer
was following a city policy reflecting the city policymakers'
deliberate indifference to constitutional rights, thus making
the city directly liable under § 1983 for causing a violation of

Accordingly, the Court will consider Haddon Township and Cavallo's motion for summary judgment on Plaintiff's <u>Monell</u> claims against them after the jury has resolved the disputed facts and the Court has determined whether Benham or Sullivan are entitled to qualified immunity.

### 2. Plaintiff's Tort, Wrongful Death, and Survivorship claims

Plaintiff has asserted several claims against the individual officers under New Jersey state law: assault and battery, false arrest/false imprisonment, negligence, gross negligence, wrongful death, and survivorship.

New Jersey's Tort Claims Act (NJTCA) governs tort claims against public employees. Under the NJTCA, "A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment." N.J.S.A. 59:3-3. The NJTCA strips a public employee of any immunity, however, if that employee is found to have engaged in "willful misconduct." N.J.S.A. 59:3-14(a).

---

the plaintiff's Fourteenth Amendment rights – in other words, where "[t]he pursuing police officer is merely the causal conduit for the constitutional violation committed by the City").

For Benham and Sullivan, whether these defendants acted in good faith cannot be determined at this time for the same reasons as Plaintiff's constitutional violation claims. This is because the same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3. See Mantz v. Chain, 239 F. Supp. 2d 486, 507-08 (D.N.J. 2002) (citing Lear v. Township of Piscataway, 566 A.2d 557 (N.J. Super. Ct. App. Div. 1989)). Furthermore, willful misconduct is "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden . . . . [I]t requires much more than an absence of good faith and much more than negligence." PBA Local No. 38 v. Woodbridge Police Dep't, 832 F. Supp. 808, 830 (D.N.J. 1993) (internal quotations omitted)). Because there exists a genuine issue of material fact regarding whether Benham and Sullivan engaged in willful misconduct, the Court cannot determine as a matter of law whether the NJTCA shields them from liability for their interaction with Norman.[8]

---

[8] Plaintiff's claim for punitive damages may be maintained for both Plaintiff's claims under § 1983 and N.J. state law. See Paige v. City of New Brunswick, 2015 WL 3452480, at *7 (D.N.J. 2015) (citing Smith v. Wade, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by

Plaintiff's wrongful death and survivorship claims may also proceed against Benham and Sullivan. Under the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, the heirs of a person who has died by virtue of "a wrongful act, neglect or default" may assert a claim for their "pecuniary injuries," N.J.S.A. 2A:31-1, -5. The New Jersey survivorship statute provides, "Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living. In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased." N.J.S.A. 2A:15-3. Because disputed facts exist as to whether Norman's death was caused by "a

---

evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."); Toto v. Ensuar, 952 A.2d 463 (N.J. 2008) (a plaintiff may recover punitive damages against public employees if the employee engaged in "willful misconduct")) (finding summary judgment not appropriate on punitive damages where there is a genuine dispute of material fact as to the defendant officers' actions relating to the plaintiff's claims of excessive force and police misconduct).

wrongful act, neglect or default," summary judgment cannot be entered in these Defendants' favor on Plaintiff's wrongful death and survivorship claims.

In contrast, the evidence, as discussed at length above, does not support a finding of willful misconduct for the other nine officers such that those officers are stripped of their good faith immunity. Consequently, Scott Dempsey, Charles Blanchard, Brian Dicugno, Jon Sierocinski, Paul Mason, Jon Robinson, Yvette Truitt, Heriberto Inostroza, and James Allen are each entitled to judgment in their favor on all the state law claims asserted by Plaintiff against them.

## CONCLUSION

For the reasons expressed above, the motions for summary judgment by Scott Dempsey, Charles Blanchard, Brian Dicugno, Jon Sierocinski, Paul Mason, Jon Robinson, Yvette Truitt, Heriberto Inostroza, James Allen, Richard J. Sarlo, Joseph T. Abate, Edwin Figueroa, John Scott Thomson, Borough of Collingswood, Borough of Oaklyn, Woodlynne Borough, and City of Camden will be granted.

The motion for summary judgment by William Benham, Joseph Sullivan, Haddon Township, and Police Chief Mark Cavallo will be denied without prejudice and will be reactivated following the

jury's resolution of special interrogatories regarding the
events that transpired on September 29, 2012.

An appropriate Order will be entered.


Date: __ June 29, 2017 __        __ s/ Noel L. Hillman _____
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.